[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Kasheta Farms, Inc. (Kasheta), brought this action to foreclose a mechanic's lien in the amount of $10,206 for landscaping and hydroseeding on property known as 469 Buckland Street in South Windsor on or about May 25, 1991. The services were performed at the request of, and pursuant to an agreement with, John Samsel, Jr. (Samsel) dated May 23, 1991 (Plaintiff's Exhibit M), under which Kasheta was to "supply the equipment, materials and labor to finish landscaping and hydroseeding the building previously started by another company, as specified by John Samsel."
Samsel had acquired the property in 1983 and subsequently contracted to develop and sell it as a condominium-type professional office complex, under a bond for deed dated April 2, 1990 (Defendant's Exhibit 3) for a total purchase price of $1,300,000 to Lawrence Andrus, a dentist, Mark Rubin, a dental surgeon, and Michael Levine, a physician, who took title to the property under the partnership name of Buckland Meadow Associates (Buckland) at a closing held on May 7, 1991. The purchase agreement provided (¶ 6) that the "[s]eller shall substantially complete, at its sole cost and expense, interior improvements to the shell building . . . to a maximum allowance of $318,500 against the Purchase Price [and that] any unused portion of the allowance shall be paid over to the [s]eller."
An amendment to the contract dated August 7, 1990 (Plaintiff's Exhibit U), which was made effective as of June 22, 1990, provided that the original deposit of $100,000 was to be "released immediately" to the seller and that "[t]he cost of carrying the premises, in the amount of $6,000 per month," was to be assumed and paid by the buyer from and after August 1, 1990. Another amendment to the bond for deed (Exhibit U, "Fourth Amendment to Bond for Deed" dated September 25, 1990), required an additional deposit from the buyer of $33,829.50 to be paid over to the mortgagee, Tolland Bank, by the seller "as payment on the existing construction loan on the [p]remises for arrearages that are presently outstanding," and also stated that Samsel, as the seller, "represents and warrants" that all construction costs have been paid and that "said payments will be evidenced by lien waivers to be provided at closing." CT Page 5252-FFF
The original bond for deed (¶ 15) provided for biweekly inspections of the premises during the construction, and Dr. Levine was the partner who came to the site on a regular basis from the inception of the project and who advised the others about the progress of the work. In the latter stages of construction, and particularly in the weeks prior to the closing, he was particularly concerned because his office was the first one scheduled for occupancy and he was in daily contact with Samsel who testified that Levine was anxious about the fact that "the outside was not going to be completed in time in order to get a certificate of occupancy for him to move in."
The original landscaping contractor on the project was Kevin Sullivan, doing business as Sullivan's Landscaping Service, who had worked on the job site from September 19, 1990 to May 20, 1991, and whose services under his contract with Samsel (Plaintiff's Exhibit K) included excavating for water, gas and electric lines, supplying and grading topsoil and removing a concrete sidewalk and replacing it with a brick walk, in addition to installing trees and plantings. In the course of his testimony at the trial (Transcript, March 5, 1996, pp. 90-91), Samsel acknowledged that he had called Sullivan on or about May 6, 1991, the day before the closing, and told him (Plaintiff's Exhibit J) that Samsel's "clients had now found [Sullivan's] workmanship unacceptable and that [they] were to return to the job site and redo the lawn areas."
Sullivan's action to foreclose his mechanic's lien was tried together with this case, and the memorandum of decision filed in that case states that "the court finds that the substitution of another landscaping contractor after May 20, 1991, was either the result of a misunderstanding between the parties or a conscious decision on the part of Samsel which was based on considerations other than the quality of the services performed by the plaintiff as alleged by the defendant." Sullivan v. Buckland MeadowAssociates, Judicial District of Tolland at Rockville, Docket No. 51236 (August 12, 1996). Samsel also testified that Levine was at the job "pretty much all the time" and that it was in his interest "both as owner and general contractor to keep [his clients] happy."
On May 7, 1991, the date set for the closing, it was discovered that the additional deposit of $33,829.50 had not been credited to Buckland, and an escrow agreement (Plaintiff's Exhibit S) was drafted which stated that although the CT Page 5252-GGG improvements contracted for were "substantially complete, there remains certain work to be completed by the Seller (the `Seller's Work') in the total amount of $43,067.00," that the remaining credit due the buyer from the "excess deposit" was $11,984.50, and that "the Buyer has placed in escrow with the Bank of South Windsor the sum of $31,082.50 to cover the cost of the Seller's Work to be completed . . .". The breakdown for the "seller's work" included two items, a "landscape allowance" of $5,020 as well as one for "landscape completion" of $12,900, which was reduced to $915.50 because of payments previously made by the buyer.
The affidavit from Samsel certifying that all construction costs incurred to date had been paid (Plaintiff's Exhibit O), which was required under the amended bond for deed, stated that there were "no other parties who have a right to a lien [on the property] except the parties" who had signed the lien waivers which were submitted at the closing with his affidavit. It was apparent from the face of the printed lien waiver forms that no one had signed off for landscaping and related "outside work" such as "Grading", "Excavating", and "Walks" that had previously been provided by Sullivan as shown on an itemized past due bill for $5,600 on April 1, 1991 for landscaping and grading (Plaintiff's Exhibit L) that was sent by Sullivan in response to Samsel's request to him for such an itemization which Samsel said "would assist [h]is clients in their final budget." Plaintiff's Exhibit J.
The plaintiff offered evidence (Plaintiff's Exhibit T) to show that the disbursements made from the escrow account after its lien was filed on August 22, 1991 included payments of $12,528 to Samsel for work done by him and/or materials that he supplied for a new office that was to be rented, as well as other disbursements made by Buckland to subcontractors and others which were apparently not within the scope of the agreement. Levine's understanding was that he believed the escrow "[c]ould be earmarked for anything and everything [he] felt needed to be done," and that Samsel "owed" Buckland work for which he was responsible in order to complete the unbuilt space that they hoped to rent as soon as possible.
He also explained that the payments to subcontractors were made in order to avoid the I situation in the earlier phase of the construction where some of them had not been paid, so that when Samsel let out contracts he would give Buckland the bill and CT Page 5252-HHH it would be paid directly "so that we were sure that we wouldn't have additional liens filed on the additional build out." He stated that the partners considered withholding moneys from Samsel in order to pay the liens that had been filed, but decided that the best way to get the new spaces rented was to begin paying as many of the subcontractors as they could in order to avoid further liens and to pay Samsel what he was actually earning rather than to hold back the money.
In addition to the arguments raised by the plaintiff that the facts of this case do not support the defendant's good faith defense, the claim is made in its brief that Buckland was "aware of the incompleted work and had knowledge of the work being done by Kasheta and consented to it being done." The defendant has not addressed that issue relying instead on the testimony of Samsel and Levine that Buckland first became aware of Kasheta's claim when it was served with notice of the lien.
Under most mechanics' lien statutes, a lien for labor performed or materials furnished with or by consent of the owner or his agent, "consent" means consent to the performance of the work, not consent to the lien or to the amount charged against the property by the lien. 53 Am.Jur.2d, Mechanics' Liens, § 117. In construing a statute very similar to § 49-33(a) of the Connecticut General Statutes, the Maine Supreme Court has held that its law does not require that owners consent to being responsible for payments to the subcontractor, "it only requires that they consent to the goods or services being provided."Biette v. Scott Dugas Trucking Excavating, Inc., 676 A.2d 490,495 (1996).
Under the Connecticut statute, "consent of the owner" does not mean that there must be an agreement with the owner but "there must be enough of a meeting of their minds to make it fairly apparent that they intended the same thing in the same sense." Huntley v. Holt, 58 Conn. 445, 449. The consent referred to in the statute means the consent of an owner for whom or for whose benefit the work is being done and refers to an owner "whois so closely identified with the work being done that he couldbe held liable under an implied contract." (Emphasis added.)Wilbur Smith Associates, Inc. v. F J, Inc., 34 Conn. Sup. 638,640.
Levine's strong personal interest in moving into his office suite, his concerns about Sullivan's delay in completing the CT Page 5252-III work, and his dissatisfaction with the work he had already done which he expressed to Samsel just before the closing, raises a reasonable inference that he may have been the procuring cause of Sullivan's unsuccessful attempt to correct the alleged unacceptable work on May 20, 1991 and his replacement by Kasheta. Nevertheless, the court concludes that the wide discretion given to Samsel under the sales contract was intended to give him the exclusive authority to employ and terminate the services of subcontractors and therefore finds that implied consent by Buckland has not been proved by the plaintiff.
Buckland's defense of payment is based on § 49-36 (c) of the General Statutes which provides that payments made by an owner in good faith to the original contractor before notice is given to the owner extinguish the subcontractor's right to a lien on the property. Tice v. Moore, 82 Conn. 244, 248-49. Accordingly, if the payments made to Samsel under the bond for deed were made to him as the "contractor" rather than the "owner" of the property there is nothing due Kasheta under his agreement with Samsel. Id.
The question of who is a contractor is essentially one of intention determined from the surrounding circumstances, and where the facts show that the vendor has undertaken to construct a building under a contract for sale of the property to the purchaser after its completion, "they cannot by any arrangement among themselves cut off the rights of lienors." McNulty Brothersv. Offerman, 116 N.E. 775, 777 (N.Y. 1917). Where the agreement on its face shows that it was not a contract between a general contractor and an owner and "the vendor agreed to make improvements thereupon for the benefit and at the expense of the vendee", it will be considered to be a contract between a vendor and a purchaser. P. Grassi Brothers v. Lovisa Pistoresi,182 N.E. 68, 70 (N.Y. 1932); annot. 83 A.L.R. 1152.
Under the undisputed facts of this case, Buckland was the record owner of the property from April 2, 1990 until May 7, 1991, and "since it could not contract with itself, could not have been a general contractor for the improvement [and therefore] the property was not exempt from liens filed by those who supplied materials and labor to the vendor." Id.
The escrow agreement between the parties at the time of closing was expressly contemplated by the parties under the terms of the original bond for deed, and was entered into by them for CT Page 5252-JJJ the purpose of "closing the transaction, notwithstanding the uncompleted work . . .". If it indeed was intended, as Levine's testimony suggests, to be a contract between Buckland as owner and Samsel as contractor, it could be construed as a subterfuge designed to defeat the claims of laborers and materialmen. Id.
Buckland's claim that the amount due Kasheta must be limited to the sums stated in the escrow agreement which were to be retained from completion of the landscaping is equally untenable. It would be manifestly unjust for a vendee under an executory contract to have the benefits of the enhanced value of the property "without any liability for any part of the labor or material which produced them." Schmaltz v. Mead, 26 N.E. 251, 253
(N.Y. 1891).
For the foregoing reasons, the court finds the issues for the plaintiff on the defendant" special defenses.
Statutory interest, attorney's fees and costs will be determined in a subsequent hearing to be held for the purpose of entering judgment on me plaintiff's complaint.
Hammer, J.